IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| SHIRLEY L. CROCKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:15cv1215 (JFA) |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter is before the court on cross-motions for summary judgment. Plaintiff seeks judicial review of the final decision of Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. *See* 42 U.S.C. §§ 423, 1382. The Commissioner's final decision is based on a finding by the Administrative Law Judge ("ALJ") and Appeals Council for the Office of Disability Adjudication and Review ("Appeals Council") that claimant was not disabled as defined by the Social Security Act and applicable regulations.[1]

On January 28, 2016, plaintiff filed a motion for summary judgment (Docket no. 14) and memorandum in support (Docket no. 15). Thereafter, the Commissioner submitted a cross-motion for summary judgment (Docket no. 16), memorandum in support (Docket no. 17), and

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Docket no. 10). In accordance with those rules, this opinion excludes any personal identifiers such as plaintiff's social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

memorandum in opposition (Docket no. 18). The two briefs submitted on behalf of the

Commissioner are identical. (Docket nos. 17, 18). Plaintiff submitted her reply brief on March

11, 2016. (Docket no. 22). For the reasons set forth below, plaintiff's motion for summary

judgment (Docket no. 14) will be denied; the Commissioner's cross-motion for summary

judgment (Docket no. 16) will be granted; and the Commissioner's final decision will be

affirmed.

## I. PROCEDURAL BACKGROUND

Plaintiff applied for DIB and SSI on February 13, 2012 and February 28, 2012,

respectively, with an alleged onset date of November 17, 2009. (AR 78–79, 180–92). The

Social Security Administration denied plaintiff's claims initially (AR 57–79, 114–35) and on

reconsideration (AR 80–109, 138–51). After receiving the notices of denial, plaintiff requested a

hearing before an ALJ.[2] (AR 152–53). The Office of Disability Adjudication and Review

acknowledged receipt of plaintiff's request (AR 154–58) and scheduled the matter for a hearing

on April 21, 2014.

On April 21, 2014, ALJ Timothy Wing held a telephonic hearing in Wilkes Barre,

Pennsylvania. (AR 28). Plaintiff appeared telephonically with her representative Megan

Dawson.[3] (*Id.*). On June 9, 2014, the ALJ issued a decision denying plaintiff's claims for

disability under the Social Security Act. (AR 10–22). In reaching this decision, the ALJ

---

[2] On February 14, 2012, plaintiff signed a form entitled "Appointment of Representative," authorizing Brad Myler to act on her behalf with respect to her asserted claims. (AR 113). On February 27, 2012, plaintiff signed another form entitled "Appointment of Representative," authorizing Thomas Klint to act on plaintiff's behalf with respect to her asserted claims. (AR 111). Both forms appear to authorize the respective representative to be plaintiff's primary representative. Plaintiff's initial request for reconsideration, dated June 12, 2012, indicated that she was represented by Brad Myler. (AR 136–37). Thereafter, plaintiff filed a "Request for Hearing by Administrative Law Judge" on November 8, 2012, indicating that she was represented by Thomas Klint. (AR 152–53). On February 13, 2014, plaintiff signed a form entitled "Appointment of Representative," authorizing Howard Olinsky to act on plaintiff's behalf with respect to her asserted claims. (AR 269). This form represented that Brad Myler continued to be plaintiff's main representative. (*Id.*).

[3] On April 4, 2014, plaintiff signed another form entitled "Appointment of Representative," authorizing Megan Dawson to act on her behalf. (AR 179). On this form, plaintiff indicated that Brad Myler was her main representative. (*Id.*).

concluded that plaintiff was not disabled under either Title II (sections 216(i) and 223(d)) or Title XVI (section 1614(a)(3)(A)) of the Social Security Act.

On July 9, 2014, plaintiff filed a request for review with the Appeals Council. (AR 8–9). On July 28, 2014, the Appeals Council granted plaintiff's request for more time to provide additional information or argument. (AR 6–7). On August 18, 2014, plaintiff provided a brief on her behalf to the Appeals Council, objecting on a number of grounds to the ALJ's decision. (AR 264–68). On July 23, 2015, the Appeals Council denied plaintiff's request for review. (AR 1–5). As a result, the decision rendered by the ALJ became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

On September 23, 2015, plaintiff filed a complaint in the U.S. District Court for the Eastern District of Virginia, seeking judicial review pursuant to 42 U.S.C. § 405(g). (Docket no. 1). Thereafter, the parties agreed to refer this matter to the undersigned magistrate judge for resolution. (Docket no. 23). This case is now before the court on cross-motions for summary judgment. (Docket nos. 14, 16).

## II. STANDARD OF REVIEW

Under the Social Security Act, the court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hays*, 907 F.2d at 1456 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). While the standard is high, where the ALJ's determination is not supported by substantial evidence on the

3

record, or where the ALJ has made an error of law, the district court must reverse the decision.
*See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

In determining whether the Commissioner's decision is supported by substantial evidence, the court must examine the record as a whole, but may not "undertake to re-weigh the conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (alteration in original) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *See Perales*, 402 U.S. at 390. Moreover, the Commissioner is charged with evaluating the medical evidence and assessing symptoms, signs, and medical findings to determine the functional capacity of the claimant. *See Hays*, 907 F.2d at 1456–57. Overall, if the Commissioner's resolution of conflicts in the evidence is supported by substantial evidence, the district court must affirm the decision. *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

### III. FACTUAL BACKGROUND

#### A.   Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1962 and was fifty-one years old at the time of the ALJ's decision. (AR 20, 22, 180). Plaintiff left school in 1976, having completed the eighth grade (AR 217), her highest level of schooling (AR 36). Plaintiff reports that she did not complete any additional training or specialized schooling. (AR 217). Plaintiff identifies working as a feeder on a pig farm from the summer of 1995 through the winter of 1996, from 1998 through 1999, and again from March 2005 through January 2006. (AR 205, 257). Subsequently, plaintiff identifies working in a warehouse as a packager from September 2006 through December 2006, September 2007 through January 2008, September 2008 through January 2009, and September 2009

4

through November 2009.[4]  (AR 205, 258).  Plaintiff's last day of employment was November 6, 2009.  (AR 257).

Plaintiff currently resides in Virginia with her husband and grandson.  (AR 37).

**B.    Summary of Plaintiff's Medical History[5]**

Plaintiff's submitted medical records contain treatment notes beginning in 2009.  (AR 456).  On February 9, 2009, plaintiff presented at the Horizon Health Services, Waverly Medical Center ("Waverly Medical Center") for a refill of her blood pressure medication.  (*Id.*).  Plaintiff indicated that she was doing well and had no complaints of shortness of breath, chest pain, dizziness, or headaches.  Plaintiff stated that she was taking her medications as prescribed, but continued to have some arthritic pain in her hands and knees.  (*Id.*).  Treatment notes indicate that plaintiff had a history of rheumatoid arthritis and was having some stiffness and pain.  (*Id.*).  Further, plaintiff indicated that she was concerned about her right thumb because it was very swollen and painful.  (*Id.*).  Plaintiff stated that naproxen works well for her arthritis, but that the medication can upset her stomach.  (*Id.*).  Finally, plaintiff indicated that her blood pressure medication did not cause her to experience any side effects.  (*Id.*).  Valeri L. Jaskowski, N.P. ("Nurse Jaskowski") examined plaintiff and indicated that her right thumb was very swollen on the first and second joint, was warm to the touch, red, tender, and had limited range-of-motion due to pain and swelling.  (AR 457).  Nurse Jaskowski assessed the plaintiff with benign hypertension and rheumatoid arthritis and recommended that plaintiff continue amlodipine and

---

[4] The AR contains differing dates for when plaintiff was employed as a feeder and packager.  The Disability Report identifies that plaintiff was employed as a feeder from January 1997 through January 1998 and as a packager from January 2000 through November 2009.  (AR 217).  However, plaintiff also identifies that she worked as a feeder from March 2005 through January 2006 and as a packager from September 2007 through January 2008, September 2008 through January 2009, and September 2009 through November 2009.  (AR 205).  The dates contained in this opinion appear to be the most consistent dates identified by plaintiff.

[5] The AR contains approximately 470 pages of medical records from various sources relating to plaintiff's medical treatments.  This summary provides an overview of plaintiff's medical treatments and conditions relevant to her claims and is not intended to be an exhaustive list of each and every medical treatment.

captopril for her hypertension and that she continue taking Tylenol and Ultram, stop naproxen, and start prednisone to treat her rheumatoid arthritis. (*Id.*). Nurse Jaskowski recommended that plaintiff follow up in four months with George C. Coleman, MD ("Dr. Coleman") for routine follow-up regarding her hypertension. (*Id.*).

On November 6, 2009, plaintiff sought treatment at Sentara Obici Hospital ("Sentara Obici") in Suffolk, Virginia for significant rectal bleeding and was transferred and admitted to Sentara Norfolk General Hospital ("Sentara Norfolk") in Norfolk, Virginia. (AR 546). Plaintiff underwent a bleeding scan upon arrival, which showed a source of the bleeding in her right colon. (AR 556). The bleeding appeared to resolve itself. (*Id.*). However, on plaintiff's third into fourth day at Sentara Norfolk, she developed further rectal bleeding. (*Id.*). After additional testing, an embolization angiography was performed, after which, plaintiff's bleeding appeared to again resolve. (*Id.*). Plaintiff was discharged on November 13, 2009 with no activity restrictions and with directions to follow up with her primary-care provider.[6] (AR 558).

Plaintiff next followed up with Dr. Coleman at Waverly Medical Center on January 6, 2010. (AR 459). Plaintiff represented to Dr. Coleman that she was not taking her prescribed medications because she had none, but did indicate that she was exercising one to three times per week. (*Id.*). Dr. Coleman assessed that the plaintiff was continuing to suffer from hypertensive disease and had an acute respiratory infection at multiple sites. (*Id.*). Dr. Coleman prescribed a treatment regime of Lisinopril for plaintiff's hypertension and medication for plaintiff's respiratory infection. (AR 459–60). Treatment notes also indicate an order to stop taking captopril, prednisone, Ultram, Tylenol, and amlodipine, and finally, to follow up in four months. (AR 460). Following additional testing, Dr. Coleman indicated that plaintiff's lipid panel was

---

[6] Plaintiff claims that she became unable to work due to her disabling condition on November 17, 2009. (AR 180, 184).

okay and indicated that plaintiff should adhere to a heart-healthy diet and be as physically active as she could be, that plaintiff's blood count showed no anemia, and that plaintiff's blood chemistry was okay. (AR 462–63).

A little over six months later, plaintiff followed up with Dr. Coleman at Waverly Medical Center on July 20, 2010. (AR 461). Plaintiff reported that she was taking her medications—Lisinopril and cough and cold medications—as prescribed and reported that she checks her blood pressure at home once per day. (*Id.*). Plaintiff also reported that she was engaging in exercise and physical activity five times per week. (*Id.*). Dr. Coleman assessed plaintiff with hypertensive disease, gastrointestinal vessel anomaly ("GVA"), and menopausal and postmenopausal disorder ("MPD"), and indicated that plaintiff should continue Lisinopril for her hypertension and ordered lab work to assess plaintiff's GVA and MPD. (AR 463). Dr. Coleman also indicated that plaintiff should stop taking the cough and cold medications and that plaintiff would be next due for a routine follow-up visit in January 2011. (*Id.*).

Plaintiff appeared at her follow-up appointment with Dr. Coleman on January 21, 2011. (AR 468). Plaintiff reported that she was doing well and that she exercised at home using a stationary bike and treadmill, but that she did not do so regularly. (*Id.*). Treatment notes further indicate that plaintiff reported no problems with her knees or back. (*Id.*). Plaintiff reported that she continued to take Lisinopril for hypertension. (*Id.*). A physical examination indicated that plaintiff experienced some pain when her hip was moved into a flexion position, but none when the hip joint was rotated—the range of motion was full. (AR 469). Plaintiff also did not report any pain upon examination of her knees. (*Id.*). Dr. Coleman assessed plaintiff as having hypertension and benign neoplasm large bowel, and treatment notes indicate that Lisinopril was to be refilled and a basic metabolic panel, cholestech lipid, and cholestech ALT/AST labs were

7

run. (AR 470). Also listed under "treatment" was information regarding exercising at a training heart rate of 65–75% of plaintiff's maximum heart rate. (*Id.*). Plaintiff was advised to return in May 2011 for a routine follow-up appointment.

Plaintiff next followed up with Waverly Medical Center for hypertension on July 8, 2011. (AR 472). Plaintiff reported that she was doing very well and was going to a gym, which seemed to help with stress and controlling her hypertension. (*Id.*). Plaintiff complained, however, of a very heavy menstrual cycle, which left her with significantly decreased energy upon occurrence. (*Id.*). Plaintiff also indicated that she was taking Lisinopril and a multivitamin. (*Id.*). Dr. Coleman described plaintiff as well-appearing. (AR 473). Dr. Coleman assessed plaintiff as continuing to suffer from hypertension and refilled her Lisinopril prescription and also ordered a metabolic panel. (AR 474). Plaintiff and Dr. Coleman also discussed the issues concerning her menstrual cycle, and Dr. Coleman indicated that they should be evaluated. To that end, plaintiff indicated she preferred to have her follow-up with Sussex Health Department and would make an appointment. (*Id.*). Plaintiff was again advised to return in six months for a follow-up appointment.

Plaintiff next presented at the Waverly Medical Center on October 24, 2011 for pain in her right foot. (AR 475). Plaintiff indicated that when she was playing with children in July 2011, she stepped in a hole and twisted her ankle. (*Id.*). Lois Brown, N.P. ("Nurse Brown") examined plaintiff and advised that she should start taking Naprosyn for her ankle pain, have varying labs drawn, and have an x-ray taken of her right foot. (AR 476). An x-ray of plaintiff's right foot was negative for fracture or dislocation and showed minimal hallux valgus of the great toe and degenerative plantar calcaneal spurring, but was otherwise normal. (AR 645).

On November 13, 2011, plaintiff presented at Sentara Norfolk Emergency Department with rectal bleeding and was admitted that day. (AR 570). Plaintiff underwent a colonoscopy, which found pancolonic diverticulosis with an active bleed in the ascending colon. (AR 571). Plaintiff reported that she had no prior instances of rectal bleeding between her prior 2009 hospital admittance and this occasion. (AR 594). Plaintiff was treated with an epinephrine injection and two clips. (AR 571). Plaintiff also began to experience heavy menstrual bleeding during her hospital admission, and as a result, her hemoglobin and hematocrit levels were monitored. (*Id.*). Plaintiff indicated that she was short of breath and had experienced shortness of breath upon exertion over the past two years. (*Id.*). Plaintiff was transfused three units of packed red-blood cells, which improved her hemoglobin and hematocrit levels and overall symptoms. (*Id.*). Electrocardiogram and echocardiogram tests were benign. (*Id*). On November 18, 2011, plaintiff was discharged following normal bowel movements and the absence of any bleeding or symptomatic anemia. (*Id.*). Plaintiff was advised about a high-fiber diet and a healthy lifestyle and was told to follow up with Dr. Coleman in two weeks. (*Id.*). Plaintiff was not put on any activity restrictions upon discharge (AR 573), but was advised to start taking omeprazole, along with continued use of Tylenol and Lisinopril (AR 628).

Plaintiff presented at Waverly Medical Center on December 8, 2011 for a follow-up visit. (AR 478). Nurse Brown examined plaintiff. Plaintiff stated that she felt fine, but that she tires quickly and always feels tired. (*Id.*). Nurse Brown indicated that plaintiff had no dyspnea on exertion and no shortness of breath. (*Id.*). Plaintiff identified that she was taking a multivitamin, Lisinopril, omeprazole, and Tylenol arthritis. (*Id.*). Nurse Brown assessed plaintiff as suffering from anemia due to acute blood loss, gastrointestinal vessel anomaly, hypertensive disease, and menometrorrhagia. (AR 479). Nurse Brown's plan to treat these ailments included plaintiff

9

starting ferrous sulfate tablets and vitamin C and continuing to take a multivitamin to treat

plaintiff's anemia, continue omeprazole to treat plaintiff's gastrointestinal vessel anomaly,

continue Lisinopril to treat plaintiff's hypertensive disease, and a referral to a gynecologist to

treat plaintiff's menometrorrhagia. (*Id.*). Plaintiff was to follow up in one week, which she did

on December 15, 2011. (AR 481). On that date, plaintiff again indicated that she was feeling

very fatigued and that her menstrual cycle came on when she was stressed and ceased when she

rested. (*Id.*). Nurse Brown assessed plaintiff as again suffering from anemia due to acute blood

loss, and ordered that she continue taking ferrous sulfate tablets, Vitamin C, and a multivitamin

with folic acid. (AR 482). Nurse Brown indicated that plaintiff should continue taking

Lisinopril and follow up in four weeks. (*Id.*).

On January 23, 2012, plaintiff presented at Waverly Medical Center for her four-week

follow-up. (AR 483). She reported that she was a little off balance and that after sitting for a

while, she is unsteady on her feet upon standing. (*Id.*). Plaintiff indicated that these symptoms

had been present since she left the hospital in November 2011. Again, a review of plaintiff's

symptoms revealed no dyspnea on exertion and no shortness of breath. (*Id.*). Nurse Brown

assessed plaintiff as continuing to suffer from anemia due to acute blood loss and hypertensive

disease and ordered that a complete blood count ("CBC") with differential be performed on

plaintiff. (AR 484). Plaintiff was to follow up in two months.

Two months later, on March 19, 2012, plaintiff presented at Waverly Medical Center for

her follow-up. (AR 485). Plaintiff indicated that she was experiencing numbness and tingling in

her left hand, had been having shortness of breath and palpitations on and off since 2009, and

finally, had been under a lot of stress over the last month. (*Id.*). A physical examination by

Nurse Brown identified that plaintiff had a full range of motion without pain in her back and

spine. (AR 486). Plaintiff also had a full range of motion throughout her upper- and lower-extremity joints. (*Id.*). Plaintiff's gait was also normal. (*Id.*). Nurse Brown assessed that plaintiff had anemia due to acute blood loss, hypertensive disease, tingling in extremities, palpitations, edema, and anxiety. (*Id.*). Nurse Brown ordered various blood-work labs, as well as a referral to neurology for the numbness in plaintiff's left side. (AR 486–87). Plaintiff was also referred to counseling services for anxiety and ordered to return for a follow-up in two months. (AR 487).

Also on March 19, 2012, Nurse Brown completed a "residual functional capacity questionnaire."[7] (AR 270). In this questionnaire, Nurse Brown identified that plaintiff suffered from palpitations, numbness, tingling, and edema. (*Id.*). Nurse Brown opined, *inter alia*, that plaintiff could walk less than one city block without rest or significant pain; could sit for 60 minutes at a time; could stand/walk for 15 minutes at a time; could sit for eight hours a day; and stand/walk for four hours a day. (*Id.*). Nurse Brown also opined that plaintiff could occasionally lift and carry less than 10 pounds, but never 20 pounds. (AR 271). She also identified that plaintiff could use her right hand, right-hand fingers, and right arm for 100% of an eight-hour workday for grasping, turning, and twisting objects; fine manipulation; and reaching, respectively. She identified, however, that plaintiff could only use her left hand, left-hand fingers, and left arm for 10% of the time during an eight-hour workday for the same categories of function. (*Id.*). Also, Nurse Brown concluded that plaintiff was likely to be absent from work more than four times per month as a result of her impairments. (*Id.*). Plaintiff was also identified as needing a psychological evaluation. (*Id.*).

---

[7] All the medical records from Waverly Medical Center preceding this visit identified plaintiff's occupation as a homemaker and contained no restrictions on her daily activity.

On March 22, 2012, plaintiff sought treatment at Central Virginia Health Services ("CVHS") after being referred for psychological services. (AR 275). Plaintiff's Lisinopril was increased to 20 mg per day and she was given a prescription for Celexa for depression, as well as trazodone for insomnia. (275–76). A physical examination showed that plaintiff had a full range of motion in her back and a straight-leg raise was negative. (AR 275).

On March 29, 2012, plaintiff presented at VCU Medical Center ("VCU") in Richmond, Virginia for menometrorrhagia. (AR 311). An endometrial biopsy was performed (AR 299) and was negative for endometrial cancer (AR 297). Plaintiff was started on Provera for the first ten days of the month and blood work was also ordered. (AR 311). A physical exam showed a normal range of motion and strength in plaintiff's musculoskeletal system. (*Id.*). Plaintiff followed-up with VCU on April 19, 2012 and reported that she was doing well, with much improvement and minimal bleeding. (AR 294, 297).

On May 3, 2012, plaintiff presented for follow-up treatment at CVHS for hypertension and depression. (AR 272). Plaintiff indicated that she had been compliant in taking her medications and that she had no chest pain, shortness of breath, or dizziness. (*Id.*). Plaintiff also reported that she had no numbness or tingling of lower extremities. (*Id.*). Plaintiff also stated that the joint pain she experiences in the morning in her hands and knees had gotten worse and indicated that when she rests, the pain resolves, but exacerbates with activities throughout the day. (*Id.*). Plaintiff finally reported that she takes Tylenol arthritis, but had not currently found any and that her insomnia had improved. (*Id.*). A physical examination indicated that plaintiff had a full range of motion in her back and in her knees, with no edema. (*Id.*). Plaintiff also had a full range of motion in her wrists, which were nontender on palpation. (*Id.*). Treatment notes indicate that plaintiff's hypertension was stable with her current medication and that she was to

12

monitor the amount of salt in her diet and exercise as tolerated.  (*Id.*).  Plaintiff was also to continue her current medication for insomnia and was given a trial of diclofenac for her joint pain.  (*Id.*).  Finally, plaintiff identified that her depression was much improved, and treatment notes indicate that she was to continue with her current medications.  (AR 273).

On May 18, 2012, plaintiff presented at VCU for her annual exam.  (AR 288).  She represented that she was doing well and that her bleeding had greatly improved.  (AR 285, 288).  Treatment notes indicate that plaintiff's hypertension was controlled with Lisinopril, her diabetes was controlled with diet, her gastro-esophageal reflux was controlled with omeprazole, and her diverticulosis was stable.  (AR 288).

On May 30, 2012, plaintiff followed up with Nurse Brown at Waverly Medical Center.  (AR 488).  Nurse Brown's progress notes indicate that plaintiff complained of right-hand pain that had been present for one week.  (*Id.*).  Plaintiff stated that for three days, she could not close her hand and that the pain radiates up her right arm to her head.  She also indicated that she used an arm brace to help with the discomfort and had been taking Tylenol arthritis and diclofenac, which helped somewhat with the pain.  (*Id.*).  Nurse Brown's physical examination showed that plaintiff had a limited range of motion with pain on left lateral bending and flexion and the right side of her back was tender to palpation.  (489).  Nurse Brown assessed plaintiff with neck pain and numbness and tingling in her right hand and indicated that plaintiff should begin taking Flexeril and undergo an x-ray of her spine and back.  (*Id.*).

The following day, May 31, 2012, plaintiff underwent an x-ray of her spine.  (AR 315, 539).  The x-ray showed "no malalignment" and "[n]o fracture."  (AR 315, 539).  The x-ray report further identified that "[t]here are prominent partially bridging anterior osteophytes at C5-C6" and "mild disc narrowing at C5-C6."  (AR 315, 539).  Also, the report stated that "[t]he

13

neural foramina are patent," "[f]acet joints are maintained," and "[t]he odontoid is normal." (AR 315, 539). The overall impression showed "[c]ervical spondylosis with mild disc narrowing at C5-C6." (AR 315, 539).

Dr. Coleman's progress notes indicate that plaintiff next followed up at Waverly Medical Center on June 8, 2012 for her hypertension and anemia. (AR 491). Plaintiff indicated that she was taking her medications as prescribed. Dr. Coleman's physical examination does not appear to note any abnormal findings; Dr. Coleman noted that plaintiff was well-appearing. (AR 493). Dr. Coleman assessed plaintiff as continuing to have hypertensive disease, anemia due to acute blood loss, gastrointestinal vessel anomaly, and anxiety associated with depression. (*Id.*). Plaintiff was instructed to continue taking 20 mg of hydrochlorothiazide-lisinopril, omeprazole, trazadone, diclofenac enteric, medroxyprogesterone, cyclobenzaprine, and additional blood work was ordered. (493–94). Plaintiff was further instructed to stop taking Flexeril and the lower dose of Lisinopril. (*Id.*).

Plaintiff next sought treatment from Waverly Medical Center on June 28, 2012. (AR 495). Nurse Brown's treatment notes indicate that plaintiff presented for right-hand pain that had been present since May 2012 and indicated that pain radiates from her finger tips to her right shoulder, back of neck. (*Id.*). Plaintiff further indicated that neck exercises help, but the pain returns. Nurse Brown assessed plaintiff as having arm pain, weakness of muscles, gait abnormality, spondylosis, and numbness and tingling of her right arm. (AR 496). Nurse Brown instructed that diagnostic imaging, consisting of an EMG, electromyogram, and nerve conduction study, be conducted for plaintiff's weakness of muscles. Nurse Brown further instructed plaintiff to begin using a cane as directed and have a CT scan conducted of her head, with and without contrast. (*Id.*).

14

A CT scan was performed on June 29, 2012 by Southside Regional Medical Center ("SRMC"). (AR 321, 540). The report indicates that "axial images from the skull base to the vertex were obtained prior to and following intravenous contrast administration." The impression notes that there was a "[s]ubtle area of low density in the left parietal lobe deep to the gray matter. This could be artefactual. Possibility of old ischemia cannot be excluded. A mass is felt to be less likely. Recommend follow[-]up as clinically warranted." (AR 321, 540–41).

Plaintiff next presented at Waverly Medical Center on July 9, 2012 for right-arm pain and numbness. (AR 498). Plaintiff identified that she had some paresthesia on the right side of her face, but that it had resolved. (*Id.*). She also identified that she had chronic intermittent weakness in her legs. (*Id.*). Dr. Coleman assessed that plaintiff should have an MRI done of her brain, with and without contrast, to assess the right-sided muscle weakness. (AR 500). Dr. Coleman also indicated, after conducting a Phalen's sign test that was positive, that findings suggested that plaintiff had carpal tunnel syndrome, but this was uncertain. (*Id.*). He further instructed plaintiff to start taking aspirin, as well as continuing her other medications. (*Id.*).

On July 10, 2012, plaintiff underwent a nerve-conduction study at SRMS. (AR 319, 529–30, 534–35). The report indicated that plaintiff's study was "normal." (AR 319, 529–30).

On July 19, 2012, plaintiff also underwent an MRI. (AR 322, 528, 533). The report noted that it was a "normal exam" and identified plaintiff as suffering from chronic pansinusitis. (AR 322, 528, 533).

On August 1, 2012, plaintiff was seen by Dr. Pavani Guntur ("Dr. Guntur") at VCU Health System, Neurology ("VCU Neurology") in Richmond, Virginia. (AR 429–32). Dr. Guntur reviewed plaintiff's MRI and nerve-conduction study. (AR 432). Dr. Guntur assessed plaintiff as having "peripheral neuropathy . . . in the setting of longstanding [diabetes mellitus]

15

with diet control" and indicated that an EMG of plaintiff's lower extremities would be beneficial. (*Id.*). Dr. Guntur's attending physician, Dr. James Bennett, assessed that plaintiff "likely has non-painful diabetic neuropathy" and agreed with the ordering of an EMG. (AR 428).

On August 10, 2012, plaintiff was seen by Dr. Sari Eapen ("Dr. Eapen"), at the request of the Virginia Department of Rehabilitative Services, for a complete medical evaluation "due to rheumatoid arthritis, carpal tunnel [syndrome], diabetes[,] and hypertension." (AR 324). A physical examination revealed, *inter alia*, that plaintiff had "[f]ull range of motion of the cervical spine, both shoulders, elbows[,] and wrists. Grip strength 4/5 on right, 5/5 on left side. Tinel sign negative at right wrist for median nerve. Phalen['s] sign negative on right." (AR 326). The examination also indicated that plaintiff had "[n]o apparent hand muscle wasting. She is able to make almost a complete fist." (AR 326). Additionally, Dr. Eapen found:

> Examination of the lumbosacral spine and lower extremities, full range of motion of the lumbosacral spine. Able to bend forward and touch the toes. Full range of motion in both hips, knees and ankles. Straight leg raising negative in both lower extremities. Muscle extensor and flexors are active and symmetrical in both upper and lower extremities. Coordination is intact finger-to-nose and heel-to-knee bilaterally. She was able to take a few steps on toes and on heels. Tandem walking is normal. She is able to stand on each leg.
> Peripheral joint evaluation without any evidence of active joint inflammation.

(*Id.*). Dr. Eapen's impressions were generalized arthralgia, right-hand pain and paresthesias, and hypertension. (*Id.*). After performing this evaluation, Dr. Eapen concluded that plaintiff "should be able to sit, stand[,] and walk without limitations. She should be able to do occasional kneeling and crouching. She should be able to bend, lift[,] and carry objects weighing 15 pounds frequently, 25 pounds occasionally. She should be able to do reaching, handling, feeling, grasping[,] and fingering without limitations." (AR 327).

On August 12, 2012, plaintiff presented at the Sentara Obici Emergency Department with intermittent lower, left-sided abdominal cramps. (AR 338). Plaintiff indicated that she was not experiencing any nausea, vomiting, fevers, chills, or sweats. (AR 335). Plaintiff underwent CT scans of her abdomen and pelvis on August 12 and 14, 2012, which identified that she was suffering from diverticulitis with micro-perforation. (AR 342–43, 345–46). Plaintiff was advised to discontinue taking diclofenac. (AR 335). Hospital records indicate that plaintiff had gradual improvement, but with continuing discomfort. (*Id.*). She was discharged on August 16, 2012 with a full liquid diet, Avelox, and Flagyl and was advised to follow up with Dr. Matthew McBee at Sentara Obici for a follow-up CT scan. (AR 333–35). Treatment notes indicate that plaintiff followed-up with Dr. McBee on August 20, 2012, who assessed that plaintiff had diverticulitis of the colon, but provided no additional details. (AR 330).

On September 7, 2012, plaintiff presented at the Waverly Medical Center for a follow-up appointment with Dr. Coleman. (AR 502). Plaintiff indicated that she had completed her antibiotics and that she had changed her diet radically, primarily eating fruits and vegetables in puree form as compared to animal fat and fried foods. (*Id.*). Plaintiff indicated that she was not having any abdominal pain. (*Id.*). Plaintiff also advised that she was scheduled for surgery at Sentara Norfolk for a segmental colon resection on September 25, 2012. (*Id.*). Dr. Coleman's treatment notes also indicate that plaintiff complained of trigger-finger problems affecting her fourth and fifth fingers of her right hand, but that plaintiff believed this issue to be a low priority considering her current situation. (*Id.*). Dr. Coleman assessed plaintiff as suffering from diverticulitis of the large intestine, hypertensive disease, and anxiety associated with depression. (AR 504). Plaintiff was advised to continue her medications for hypertension (aspirin and

hydrochlorothiazide-lisinopril) and anxiety (citalopram and trazodone) and also continue taking omeprazole, but was instructed to discontinue all others. (*Id.*).

Plaintiff again presented at the Sentara Norfolk Emergency Department on the morning of September 11, 2012 with complaints of abdominal pain. (AR 352–53). Plaintiff's abdomen was soft and tender to palpation. (AR 364). During the afternoon of September 11, 2012, plaintiff indicated that she had no further complaints of abdominal pain. (AR 363). Plaintiff's abdominal CT scan was negative for any acute process, and plaintiff experienced no tenderness during a physical exam of her abdomen. (AR 354). Plaintiff was discharged that same day with no pain being experienced. (*Id.*). The following day, September 12, 2012, plaintiff followed-up with Nurse Brown at Waverly Medical Center. (AR 508). Plaintiff indicated that she was to undergo a left colectomy on September 25, 2012. (*Id.*). Nurse Brown advised plaintiff to follow up with her planned surgery and follow up as necessary. (AR 509).

On October 6, 2012, plaintiff presented at the Sentara Norfolk Emergency Department with left-flank and lower-left quadrant pain. (AR 380). Plaintiff complained that the left flank paid was intermittent and had been present for the prior three days. (*Id.*). A physical examination indicated that plaintiff's abdomen was tender to palpation. (AR 379). Plaintiff also underwent a CT scan of her abdomen. After experiencing no pain later in the evening, plaintiff was discharged. (AR 378). Treatment notes indicate that plaintiff was to have surgery the upcoming week for diverticulitis. (AR 380).

On November 29, 2012, plaintiff underwent an additional EMG study. (AR 408). Dr. Binod Wagle indicated that it was "a normal electrophysiologic study of bilateral lower extremities with no evidence of a large fiber neuropathy. However, a small fiber neuropathy

cannot be excluded." (AR 414). The report indicated that "[c]linical correlation is advised." (*Id.*).

On December 13, 2012, plaintiff again presented at Waverly Medical Center. (AR 511). Nurse Brown's treatment notes indicate that plaintiff was following-up on her "lower hemicolectomy [with] mobilization of the splenic flexure and primary end-to-end anastomosis at the level of the rectum" which occurred at Sentara Norfolk two months earlier on October 11, 2012.[8] (AR 511). Plaintiff indicated that she was experiencing lower left-side back pain that radiates to her left hip that she only feels during activity. Plaintiff indicated that she had been taking muscle relaxers and pain medications, which help but wear off. (*Id.*). Nurse Brown started plaintiff on prednisone and directed that she have an x-ray completed of her spine and lumbosacral, in addition to plaintiff continuing on her other medications for back pack, hypertension, anxiety, and reflux. (AR 512). On that same day, plaintiff underwent an x-ray of her back at SRMC. (AR 527, 532). The "[f]ive views of the lumbar spine" indicated "[t]here is normal alignment of the lumbar vertebral column. There is no lumbar vertebral body compression deformity. There is no degenerative change of significance." (AR 527, 532).

On January 9, 2013, plaintiff followed up with VCU Neurology. (AR 404–07). Dr. Alicia M. Zukas ("Dr. Zukas") indicated that plaintiff had clinical signs of peripheral neuropathy in the setting of her diabetes mellitus. (AR 407). Dr. Zukas prescribed plaintiff gabapentin for nerve pain. (*Id.*).

On January 10, 2013, plaintiff presented at Waverly Medical Center with complaints of recurrent low-back pain. (AR 514). Plaintiff indicated that all her pain began after her surgery. Nurse Brown's treatment notes indicate that plaintiff was instructed to start naproxen tablets, and was referred to rehabilitation for her back. (AR 515).

---

[8] The AR does not appear to contain treatment notes detailing plaintiff's surgery on October 11, 2012.

Plaintiff began physical therapy on January 29, 2013 with Colonial Orthopedics in Colonial Heights, Virginia. (AR 451–53). Plaintiff identified that she was beginning physical therapy because of the pain in her back. (AR 451). An initial physical examination by Dr. Jay Pavan ("Dr. Pavan") noted that plaintiff's lumbar spine had no spinal deformity and there was no paraspinal spasm. (AR 452). Dr. Pavan indicated that there was tenderness in the lower-lumbar level, which showed a flexion of the spine up to 60 degrees with pain and an extension past 10 degrees producing pain. (*Id.*). Plaintiff's toe walking and heel walking were normal and her gait and station were normal. (*Id.*). Lumbar spine x-rays performed on January 29, 2013 showed "diffuse lumbar facet [degenerative joint disease]" and mild lumbar spondylosis, with vertebral body heights and disc spaces appearing intact. (*Id.*). Dr. Pavan and the plaintiff considered activity modification, physical therapy, further imaging studies, medications, injections, and surgery and, from those, selected a treatment plan that included the plaintiff beginning meloxicam and physical therapy and stopping naproxen. (*Id.*).

On March 29, 2013, plaintiff presented at Waverly Medical Center for an evaluation for disability. (AR 519–21). Dr. Coleman's examination of plaintiff identified that she was "[o]bese, appears to be in some discomfort," but was in no distress. (AR 521). A musculoskeletal exam revealed

> pain with range of motion of both shoulders, however range of motion is full. There is tenderness with palpation of the wrists bilaterally, no warmth or synovial thickening. Wrists and hands are normal to inspection. Phalen's sign is positive bilaterally at the wrists. Lower extremities reveal pain with flexion of the hip and knee bilaterally but full range of motion. Normal strength in all extremities.

(*Id.*). After he identified that plaintiff presented for a disability examination, Dr. Coleman then noted,

> Because of her general deconditioning, diffuse chronic pain, [and] carpal tunnel syndrome[,] she is currently not able to perform his [sic] usual duties at her job.

20

She did not provide me with a job description on paper but this is based on her verbal description of assignments and of her functional status.

(*Id.*).

On April 25, 2013, plaintiff underwent an MRI of her lower spine without contrast. (AR 731). The study's conclusion was: "Degenerative facet joint disease L4-L5 and L5-S1. No disc herniation or significant central or foraminal stenosis." (*Id.*).

Plaintiff telephoned Dr. Coleman on May 12, 2013 for "chart review for form completion." (AR 523). The AR does not appear to contain any form completed by Dr. Coleman after plaintiff's follow-up telephone call.

On July 31, 2013, plaintiff presented at VCU Neurology for a follow-up visit for numbness and tingling in her right side. (AR 679). Plaintiff was assessed with clinical signs of peripheral neuropathy in the setting of longstanding diabetes mellitus with diet control. (AR 700). Based on a normal EMG of plaintiff's lower extremities that showed no evidence of neuropathy, a recent workup of cord imaging that showed only mild arthritis, and that plaintiff's symptoms had been stable for years, Dr. Robert M. Baldwin ("Dr. Baldwin") advised plaintiff to return to the clinic in six months. (AR 701). Dr. Robert J. Delorenzo's ("Dr. Delorenzo") treatment notes also indicate that a repeat MRI of plaintiff's head in a year was advised. (*Id.*).

Plaintiff attended a physical therapy session with Colonial Orthopedics in November 2013. (AR 724–25). A physical exam on that date identified that plaintiff's lower extremity strength was normal and her gait was stable. Plaintiff declined facet injections and was to continue to use her TENS unit, which was helping. (AR 725). She was also advised to continue her home exercise program. (*Id.*).

Next, plaintiff followed up with VCU Neurology on February 5, 2014. (AR 649–65). Plaintiff complained at that visit that the numbness/tingling in her left upper and lower

21

extremities was slowly worsening. (AR 661). Treatment notes indicate that plaintiff was experiencing frequent imbalance and falls. (AR 664). Dr. Baldwin advised that plaintiff should increase her prescription for gabapentin, be evaluated for physical therapy, and have an MRI of her cervical spine. (*Id.*). Drs. Baldwin and Delorenzo assessed that plaintiff had clinical signs of "peripheral neuropathy [of her lower- and upper-extremities] in the setting of longstanding diabetes mellitus with diet control." (*Id.*). Treatment notes indicate that an "EMG of [plaintiff's lower extremities] shows no evidence of neuropathy" and a "[r]ecent workup of cord imaging showed only mild arthritis." (*Id.*). Dr. Delorenzo also indicated that plaintiff had "chronic [left-upper extremities and lower-left extremity] sensory changes for over 20 years. No major changes . . . ." (*Id.*).

Nurse Brown completed a "residual functional capacity questionnaire" on February 24, 2014. Nurse Brown identified that plaintiff suffered from neuropathic pain, lumbar and sacral spondylosis, and arthritis. (AR 703). She furthered identified that plaintiff could only sit for 5 minutes at a time and stand/walk for 10 minutes at one time. (*Id.*). Nurse Brown also indicated that plaintiff could frequently lift and carry less than 10 pounds, but never lift and carry 10 pounds or more. (AR 704). In this questionnaire, she also identified that plaintiff could not use her right hand, right-hand fingers, and right arm for any percentage of an eight-hour workday, but could use her left hand, left-hand fingers, and left arm for 25%, 50%, and 50% of an eight-hour workday for grasping, turning, and twisting objects; fine manipulation; and reaching, respectively. (*Id.*).

Plaintiff also underwent physical therapy sessions at Colonial Orthopedics from February 2014 through March 2014 (AR 714–23). On March 13, 2014, plaintiff identified that "[i]t's a lot better. I can close my hand now. No pain at rest." (AR 716). On that date, plaintiff's left-hand

grip was 16 kilograms and her right-hand grip was 9 kilograms. (*Id.*). On March 20, 2014, plaintiff indicated that "[i]t's doing well. No pain at rest." (AR 715). Treatment notes also indicated that plaintiff's grip in her right hand was 14 kilograms. (*Id.*).

On March 21, 2014, plaintiff underwent a stress test due to chest pain. (AR 711). The stress ECG, perfusion status, attenuation, and LV function were normal. (AR 712). Next, on March 26, 2014, plaintiff underwent an MRI of her cervical spine without contrast. (AR 707). The exam findings indicate that plaintiff's vertebral body heights and alignment were within normal limits, disc spaces were normal in height, and the spinal cord had normal signal characteristics. The impression of the study was borderline canal stenosis C5-6 and small central disc protrusion C3-4. (*Id.*).

On March 27, 2014, her last session at Colonial Orthopedics, plaintiff reported that "[i]t's all good. No pain at rest." (AR 714). At that time, treatment notes indicate that plaintiff had completed 4 out of 5 of her therapeutic goals and was ready to be discharged from physical therapy. (*Id.*). Plaintiff's right-hand grip was again 14 kilograms. (*Id.*).

### C.    The ALJ's Decision on June 9, 2014

Under 42 U.S.C. §§ 423(d)(5) and 1382c(a)(3)(H)(i), the individual claiming entitlement to disability benefits has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). The Social Security Regulations set forth a five-step sequential evaluation for the adjudication of disability claims. It is this process the court examines on appeal to determine whether the correct legal standards were applied and whether the final decision is supported by substantial evidence. Specifically, the Commissioner must consider whether a claimant: (1) is currently engaged in substantial gainful employment; (2) has a severe impairment; (3) has an impairment that meets or equals any of the impairments listed in

Appendix 1, Subpart P of the regulations that are considered *per se* disabling; (4) has the ability

to perform her past relevant work; and (5) if unable to return to past relevant work, whether

claimant can perform other work that exists in significant numbers in the national economy. *See*

20 C.F.R. §§ 404.1520 (DIB); 416.920 (SSI).  The regulations promulgated by the Social

Security Administration also provide that all relevant evidence will be considered in determining

whether a claimant has a disability. *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3).  Lastly,

when considering a claim for DIB, the Commissioner must determine whether the insured status

requirements of sections 216(i) and 223 of the Social Security Act are met. *See* 42 U.S.C. §§

416(i), 423.

     Here, the ALJ made the following findings of fact: (1) plaintiff meets the insured status

requirements of the Social Security Act through March 31, 2011; (2) the record does not

establish that plaintiff engaged in substantial gainful activity since November 17, 2009, the

alleged onset date; (3) plaintiff has the following severe impairments: obesity, lumbar spinal

disorder, and inflammatory arthritis; (4) plaintiff does not have an impairment or combination of

impairments that meets or medically equals the severity of one of the listed impairments in 20

C.F.R. § 404, Subpart P, Appendix 1; (5) plaintiff has the residual functional capacity to perform

light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) assuming certain postural,

manipulative, and environmental limitations[9]; (6) plaintiff is capable of performing past relevant

work as a packager, which is classified as medium duty unskilled work, but which was

performed at the light exertional level, and this work does not require the performance of work-

related activities precluded by the plaintiff's residual functional capacity, or alternatively,

considering plaintiff's age, education, work experience, and residual functional capacity, plaintiff

---

     [9] Those limitations include "no more than occasional postural maneuvers, such as balancing, stooping,
kneeling, crouching and climbing on ramps and stairs," and no "climbing on ladders or crawling" or "exposure to
dangerous machinery and unprotected heights." (AR 16).

is capable of making a successful adjustment to other work that exists in significant numbers in the national economy; and (7) plaintiff has not been under a disability, as defined in the Social Security Act, from November 17, 2009 through the date of the ALJ's decision. (AR 15–22).

## IV. ANALYSIS

### A.    Overview

On September 23, 2015, plaintiff filed a complaint in the U.S. District Court for the Eastern District of Virginia seeking review pursuant to 42 U.S.C. § 405(g). (Docket no. 1).

Plaintiff's motion for summary judgment argues that four errors were committed by the ALJ. (Docket no. 15). The first relates to the ALJ's residual functional capacity assessment prior to step four of the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). Plaintiff argues the ALJ erred in determining that plaintiff was capable of performing light work by first failing to evaluate a purported medical opinion of plaintiff's treating physician, Dr. Coleman. (Docket no. 15 at 11–13). Specifically, plaintiff claims the ALJ's decision does not include "an evaluation of Dr. Coleman's opinion of limitations," in which Dr. Coleman writes on March 29, 2013:

> Because of her general deconditioning, diffuse chronic pain, [and] carpal tunnel syndrome[,] she is currently not able to perform his [sic] usual duties at her job. She did not provide me with a job description on paper[,] but this is based on her verbal description of her assignments and her functional status.

(AR 521). Plaintiff claims that Dr. Coleman's March 29, 2013 notation constitutes a medical opinion, and thus, the ALJ erred in not evaluating it. (Docket no. 15 at 11). Plaintiff next argues the ALJ erred in determining that plaintiff was capable of performing light work by failing to give proper weight to Nurse Brown's March 2012 and February 2014 opinions of limitation. Here, plaintiff claims that the ALJ erred in placing no weight on Nurse Brown's March 2012 opinion on account of the ALJ's uncertainty on who authored the opinion, when the record

evidence demonstrates Nurse Brown wrote the assessment. (Docket no. 15 at 14). Plaintiff also claims the ALJ erred in placing no weight on Nurse Brown's March 2012 and February 2014 evaluations because the ALJ failed to provide any analysis for his decision. (*Id.*). Finally, plaintiff also argues the ALJ's residual functional capacity determination was in error because the ALJ failed to account for plaintiff's limitations that result from her prescribed cane use. (Docket no. 15 at 17–18).

Plaintiff's second claimed error is that the ALJ's failure to include carpal tunnel syndrome as a severe impairment at step two of the sequential evaluation process was in error. (Docket no. 15 at 18); *see generally* 20 C.F.R. §§ 404.1520(a)(1)(4)(ii) (second sequential step description), 416.920(a)(4)(ii) (same). Specifically, plaintiff argues that the "ALJ determined that [plaintiff's] severe impairments included only obesity, lumbar spinal disorder, and inflammatory arthritis," but failed to find plaintiff's carpal tunnel syndrome to be severe despite medical evidence suggesting its severity. (Docket no. 15 at 18). Plaintiff also argues that the ALJ's failure to include any limitations concerning carpal tunnel syndrome in her residual functional capacity was error. (Docket no. 15 at 19 n.5).

The third claimed error relates to the ALJ's determination that plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (Docket no. 15 at 19). Plaintiff claims that the ALJ failed to properly articulate specific and adequate reasons for discrediting plaintiff's statements.

The fourth and final error relates to the ALJ's conclusions at the fourth and fifth steps of the sequential evaluation process—finding that plaintiff is capable of performing her past relevant work as a packager performed at the light exertional level and alternatively, that there are other jobs existing in the national economy that she is able to perform. (Docket no. 15 at 21;

AR 20). Prior to making this determination, the ALJ considered plaintiff's residual functional capacity and the physical and mental demands of plaintiff's prior work as a packager. (AR 20). Based on this comparison, the ALJ found that plaintiff would be able to perform her past work as a packager and was not disabled as a result. Alternatively, the ALJ considered plaintiff's residual functional capacity and the vocational factors of age, education, and work experience as required by 20 C.F.R. §§ 404.1560(c), 416.960(c). The ALJ also considered the testimony of a vocational expert who determined that plaintiff would be able to perform several unskilled, light duty occupations, including: box inspector, ticketer, and produce weigher. (AR 21, 54). Based on this testimony, the ALJ found that plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (*Id.*). Generally, plaintiff argues that the ALJ's errors at steps two and three in the sequential process, described above, caused the ALJ's conclusions at step four and alternatively, step five, to be in error. (*Id.*).

Based on the foregoing, plaintiff argues the decision rendered by the ALJ—and subsequently adopted as the final decision of the Commissioner—is not supported by substantial evidence and was the product of legal error. The Commissioner rebuts this assertion, claiming first that the ALJ correctly determined at step two of the sequential process that plaintiff suffered certain "severe" impairments and any purported error in failing to consider additional impairments was harmless. (Docket no. 17 at 11). The Commissioner next argues that substantial evidence exists to support the ALJ's determination of plaintiff's residual functional capacity, as the ALJ properly considered plaintiff's carpal tunnel syndrome, her use of a cane, properly considered Nurse Brown's questionnaire and Dr. Coleman's purported opinion, and properly analyzed the plaintiff's credibility. (Docket no. 17 at 12–22). Finally, the Commissioner argues that the ALJ asked the vocational expert a hypothetical question that

27

properly reflected plaintiff's residual functional capacity as determined by the ALJ, and because this residual functional capacity is supported by substantial evidence, the ALJ committed no error at steps four and five. (Docket no. 17 at 22).

Plaintiff seeks reversal of the ALJ's decision on June 9, 2014, which subsequently became the final decision of the Commissioner after the Appeals Council affirmed Judge Wing's ruling on July 23, 2015 (AR 1–5), and a remand of the matter for further administrative proceedings. The Commissioner requests that the final decision be affirmed. As previously stated, judicial review under these circumstances is limited to considering whether the ALJ's findings are supported by substantial evidence and whether the applicable regulations were correctly applied in reaching a decision. *See Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). The court will address plaintiff's arguments in the order presented.

B. **The ALJ's Determination of Plaintiff's Residual Functional Capacity Is Supported by Substantial Evidence and Was Determined in Accordance with Applicable Law**

Plaintiff argues that the ALJ's determination of her residual functional capacity ("RFC") is not supported by substantial evidence for three reasons. First, plaintiff argues the ALJ erred when he failed to consider Dr. Coleman's March 29, 2013 statements as a medical source opinion. Second, plaintiff argues the ALJ erred in giving Nurse Brown's questionnaires "no weight" without providing an adequate basis for doing so. Third, plaintiff argues the ALJ erred when he failed to account for plaintiff's limitations that result from her prescribed cane use.

1. The ALJ Did Not Err in Failing to Specifically Address the March 29, 2013 Statement by Dr. Coleman

The plaintiff's first contention is that the ALJ erred when he failed to consider an opinion of plaintiff's treating physician. On March 29, 2013, plaintiff visited the Waverly Medical Center to "have disability forms filled out." (AR 519). Plaintiff brought with her a "disability

form" and indicated that she "[p]reviously worked in production packing boxes for shipment."

(*Id.*). Treatment notes indicate that plaintiff stated that "she is no longer able to do this kind of

work because of [an] inability to stand long or sitting long because of leg and back pain as well

as bilateral hand and wrist pain [and] weakness." (*Id.*). Plaintiff also reported "having

difficulties with cognition [and] completing tasks." She indicated that "[h]er back pain is at

times stabbing, other times burning throughout the low back and left thigh" and that "the back

pain began after her hemicolectomy in October" 2012. (*Id.*). Finally, plaintiff indicated that she

had "tried physical therapy [and a] TENS unit helps but [she] does not have one for home use."

(*Id.*). Dr. Coleman, who plaintiff had seen over a number of prior visits (*see* AR 459, 461, 468,

473, 493), then conducted a physical examination of plaintiff. (AR 521). Dr. Coleman's

physical examination indicated that plaintiff was "[o]bese [and] appears to be in some

discomfort" but was not in "distress." (*Id.*). Dr. Coleman noted that plaintiff was "able to

transfer independently from chair to exam table" and a musculoskeletal exam revealed

> pain with range of motion of both shoulders, however range of motion is full.
> There is tenderness with palpation of the wrists bilaterally, no warmth or synovial
> thickening. Wrists and hands are normal to inspection. Phalen's sign is positive
> bilaterally at the wrists. Lower extremities reveal pain with flexion of the hip and
> knee bilaterally but full range of motion. Normal strength in all extremities.

(*Id.*). Dr. Coleman listed 7 assessments after his physical examination: (1) Encounter for

disability examination; (2) neuropathic pain; (3) hypertensive disease; (4) diverticulitis of the

large intestine; (5) Type II diabetes mellitus; (6) carpal tunnel syndrome; and (7) back pain.

(*Id.*). Dr. Coleman then noted under the heading "Treatment" and subheading "1. Encounter for

disability examination":

> Because of her general deconditioning, diffuse chronic pain, [and] carpal tunnel
> syndrome[,] she is currently not able to perform his [sic] usual duties at her job.
> She did not provide me with a job description on paper but this is based on her
> verbal description of assignments and of her functional status.

(*Id.*). The ALJ did not expressly consider or note plaintiff's March 29, 2013 examination by Dr. Coleman nor Dr. Coleman's statement contained in his treatment notes from that date.

Plaintiff argues the failure to consider this statement constitutes error because Dr. Coleman's statement was a medical opinion. (Docket no. 15 at 11; Docket no. 22). The Commissioner argues that Dr. Coleman's statement was not a medical opinion, but instead a recitation of plaintiff's own analysis of her functionality that was devoid of any identification of any specific functions that Dr. Coleman believed plaintiff to be unable to perform. (Docket no. 17 at 19). To the extent such a record was Dr. Coleman's own opinion, the Commissioner argues that any failure to expressly consider it was harmless error. (Docket no. 17 at 20).

The regulations "draw a distinction between a physician's medical opinion and his legal conclusions." *Morgan v. Barnhart*, 142 F. App'x 716, 721 (4th Cir. 2005). "Medical opinions are statements from physicians . . . that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). "Legal conclusions, on the other hand, are opinions on issues reserved to the ALJ, such as 'statements[s] by a medical source that [the claimant is] 'disabled' or 'unable to work.'" *Morgan*, 142 F. App'x at 721-22 (alterations in original) (quoting 20 C.F.R. § 404.1527(e)(1)). An ALJ must give a treating physician's medical opinions special weight in certain circumstances. *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record (quoting 20 C.F.R. § 404.1527(d)(2))). An ALJ is not, however, obligated to give a treating physician's *legal* conclusions any heightened

30

evidentiary value. *Morgan*, 142 F. App'x at 722 (citing 20 C.F.R. § 404.1527(e)(3)).

Nevertheless, the ALJ must not simply ignore a treating physician's legal conclusions, but

instead "must evaluate all the evidence in the case record to determine the extent to which the

[treating physician's legal conclusion] is supported by the record." SSR 96-5p, 1996 WL

374183, at *3 (July 2, 1996). To the extent a treating physician's legal conclusion contributes

very little to the record, an ALJ's failure to discuss the opinion is harmless error. *Winder v.*

*Astrue*, No. 1:11-CV-956, 2012 WL 4461284, at *5 (E.D. Va. Sept. 24, 2012).

Plaintiff's contention that Dr. Coleman's statement constitutes an "opinion of limitations"

and a "medical opinion" is baseless. Dr. Coleman's statement[10] merely expressed an opinion on

plaintiff's ability to return to her previous work in packaging, and as such, is a legal opinion. *See*

*Morgan*, 142 F. App'x at 722 ("[A]n opinion that [a claimant] cannot complete the duties of her

previous job is merely a legal conclusion on an issue reserved for the ALJ at the fourth step of

the sequential evaluation process.") (citing 20 C.F.R. § 404.1520(a)(4)(iv)). That Dr. Coleman

"tied his determination to Plaintiff's impairments" does not transform his *legal* opinion into a

medical one, as plaintiff suggests. (*See* Docket no. 22 at 2). Instead, it merely provides the basis

upon which Dr. Coleman rendered his legal opinion. Accordingly, as a legal conclusion, Dr.

Coleman's opinion is not deserving of any special weight, but instead "is persuasive only if

supported elsewhere in the record." *Winder*, 2012 WL 4461284, at *5.

---

[10] The Commissioner's argument that Dr. Coleman's statement was merely a reflection of plaintiff's statements to him and not his own opinion is unpersuasive. In fact, the Commissioner has omitted and replaced a word in Dr. Coleman's treatment notes when arguing that Dr. Coleman's statement is a mere recitation of plaintiff's conclusions, and in doing so, changes the meaning of Dr. Coleman's statement. The Commissioner identified that Dr. Coleman wrote that "[b]ecause of her general deconditioning, diffuse chronic pain, [and] carpal tunnel syndrome she [was] currently not able to perform his [sic] usual duties at her job." (Docket no. 17 at 19) (alterations in original). However, Dr. Coleman's statement actually provides, "Because of her general deconditioning, diffuse chronic pain, carpal tunnel syndrome she *is* currently not able to perform his usual duties at her job." (AR 521) (emphasis added). The omission of "is" and its replacement with "was" makes Dr. Coleman's statement appear to be merely descriptive of plaintiff's ability to perform her previous work in 2009, instead of her ability to perform her previous work on March 29, 2013 during Dr. Coleman's assessment.

While Dr. Coleman was plaintiff's treating physician and had examined plaintiff for a number of years prior to March 29, 2013, *see* 20 C.F.R. § 404.1527(c)(1)–(2) (describing how an examining relationship and treatment relationship of a physician are considered in the weight to be given an opinion), other factors weigh against assigning great credibility to Dr. Coleman's March 29, 2013 statement. First, Dr. Coleman explicitly indicates that his statement was based in part on plaintiff's description of her functional status. (AR 521). Moreover, Dr. Coleman's statement was also based on plaintiff's "verbal description of assignments" at her previous occupation and Dr. Coleman was not provided a job description of plaintiff's previous work as a packager. (*Id.*). Such bases provide Dr. Coleman's opinion with very little credibility. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, . . . the more weight [the ALJ] will give that opinion."). Furthermore, Dr. Coleman did not explain how his physical examination of plaintiff that day or how plaintiff's lab or exam findings from other days—that, for example, discounted a finding of carpal tunnel syndrome (AR 529)—corroborate his prediction that plaintiff could not perform the usual duties at her job. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give that opinion"). Dr. Coleman also failed to indicate why the impairments he listed prevent plaintiff from performing the usual duties at her previous position. *See* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight [the ALJ] will give that opinion."). For these reasons, the credibility of Dr. Coleman's legal opinion is low.

Moreover, the impairments listed by Dr. Coleman—"general deconditioning, diffuse chronic pain, and carpal tunnel syndrome"—were all discussed by the ALJ, with the ALJ finding plaintiff's obesity, lumbar spinal disorder, and inflammatory arthritis all to be severe

impairments (AR 15) and plaintiff's exam results suggesting a lack of carpal tunnel syndrome (*See infra* Part IV.C). Consequently, Dr. Coleman's March 29, 2013 statement offered very little contribution to the record in this matter regarding the impairments he listed. *See Winder*, 2012 WL 4461284, at *5 (holding harmless an ALJ's lack of discussion of a legal opinion that offered "very limited contribution to the record").

For the foregoing reasons, the court finds that the failure of the ALJ to consider Dr. Coleman's March 29, 2013 statement was harmless.

> ### 2. The ALJ Properly Considered the Residual Functional Capacity Assessments of Nurse Brown

Plaintiff next asserts that the ALJ erred in giving no weight to two opinions of Nurse Brown. (Docket no. 15 at 13). An ALJ must explicitly indicate the weight given to all considered evidence. *Gordon v. Schweiker*, 725 F.2d 231, 235–36 (4th Cir. 1984). "An ALJ must also note whether a claimant's primary care medical source is an 'acceptable medical source' for the purpose of determining Social Security Disability and give weight to that source accordingly." *Fallon v. Colvin*, No. 2:12-CV-423, 2013 WL 5423845, at *9 (E.D. Va. Sept. 26, 2013). Acceptable medical sources include both licensed physicians and osteopathic doctors. 20 C.F.R. §§ 404.1513(a)(1), 416.913(a)(1). A nurse practitioner, however, is considered an "other source," and thus is not an acceptable medical source. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). This is significant because only an acceptable medical source can be a "treating source," whose medical opinions can receive controlling weight by an ALJ. 20 C.F.R. §§ 404.1527(d), 416.927(d)(2). The regulations provide that the ALJ *may* also use evidence from "other sources" such as nurse practitioners. 20 C.F.R. §§ 404.1513(d), 416.913(d). Thus, the ALJ is not required to use evidence from an "other source." However, SSR 06-03p states that the Social Security Administration considers all relevant evidence in disability determinations,

including opinion evidence from "other sources." SSR 06-03p, 2006 WL 2329939, at *4 (Aug. 9, 2006). Thus, to the extent an ALJ evaluates an opinion from a nurse practitioner, the weight given to such sources "will vary according to the particular facts of the case, the source of the opinion," the source's qualifications, and additional factors, including how long the source has known the claimant, how frequently the source has seen the claimant, how consistent the opinion is with other evidence, the extent to which the source presents relevant evidence to support their opinion, and how well the source explains the opinion. *Id.* An ALJ may assign "no weight" to an opinion so long as the ALJ articulates "specific and legitimate reasons" for rejecting the opinion. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (per curiam) (unpublished) (discussing the rejection of a treating physician's medical opinion).

Plaintiff contends that the ALJ's allocation of "no weight" to Nurse Brown's March 2012 and February 2014 assessments was improper. First, plaintiff argues that the ALJ improperly discounted Nurse Brown's March 2012 opinion because the ALJ was unsure of the source of the opinion. Plaintiff cites the ALJ's statement that the ALJ was unclear "if this opinion was prepared by a doctor or other acceptable medical source." (AR 19). However, in the next paragraph, the ALJ also noted that Nurse Brown "appears to be the person who prepared the March 2012 questionnaire" and the ALJ's opinion makes clear he proceeded on such an assumption. (*See id.*) ("[I]n the most recent [questionnaire of February 2014], she reduced claimant's physical exertional capacity to a range of sedentary work and continued to opine that her symptoms would cause her to miss work more than four times per month."). Thus, despite noting uncertainty regarding the author of the March 2012 questionnaire, it is clear the ALJ found Nurse Brown to be the author. For this reason, plaintiff's argument that the ALJ

improperly discounted the March 2012 questionnaire because of uncertainty regarding its author is without merit.

Next, the plaintiff argues that the ALJ "improperly discounted [the questionnaires] for an alleged lack of objective findings to support the opinions and because NP Brown is a nurse practitioner." (Docket no 15 at 14). The ALJ properly gave Nurse Brown's residual functional capacity questionnaires no weight. First, the ALJ noted that the questionnaires were inconsistent with each other and provided no "objective findings or basis" for the inconsistency. (AR 19); *see* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, . . . the more weight [the ALJ] will give that opinion."). Specifically, the ALJ noted that the questionnaires came to inconsistent conclusions regarding plaintiff's residual functional capacity without providing findings or clinical evidence to support such a change. (AR 19). As described by the ALJ, the March 2012 report found that the plaintiff was capable of performing a range of light level exertional work, while the February 2014 report reduced plaintiff's capacity to a range of sedentary work. (*Id.*). In fact, the March 2012 questionnaire reported that plaintiff could use her right hand, right-hand fingers, and right arm for 100% of an eight-hour workday for grasping, turning, and twisting objects; fine manipulation; and reaching, respectively. (AR 271). The March 2012 report also indicated that plaintiff's left hand, left-hand fingers, and left arm were 10% for each category. (*Id.*). Then, in February 2014, Nurse Brown opined that plaintiff's right hand, right-hand fingers, and right arm were 0% for each category, while plaintiff's left hand, left-hand fingers, and left arm were now 25%, 50%, and 50%, respectively. (AR 704). As the ALJ concluded, Nurse Brown did not identify any objective basis or evidence for the change in functional status in the February 2014 questionnaire and the inconsistency with her earlier questionnaire. (AR 19); *see Craig*, 76 F.3d at 590 (4th Cir.

35

1996) ("[I]f a physician's opinion . . . is inconsistent with other substantial evidence, it should be accorded significantly less weight."); SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996) (discussing that lower weight may be given when a medical source opinion is inconsistent with other substantial evidence in the case record).

The ALJ also identified that Nurse Brown did not provide any evidence or clinical findings to support her conclusions in March 2012 and February 2014, namely that plaintiff's symptoms would cause her to miss work more than four times per month. (AR 19, 271, 704); *see* 20 C.F.R. § 404.1527(c)(3). Furthermore, the ALJ noted that such conclusions were inconsistent with the totality of the evidence. (AR 19); *see Craig*, 76 F.3d at 590 (4th Cir. 1996). For example, the ALJ noted that in August 2012, Dr. Eapen's examination found that plaintiff's grip strength was 4/5 in her right hand and 5/5 in her left hand and that she was able to make almost a complete fist. (AR 19, 326). Additionally, the ALJ noted that in July 2013, plaintiff underwent an EMG secondary to complaints of peripheral neuropathy. (AR 18–19, 700). The ALJ noted that this study revealed that a "workup of cord imaging showed only mild arthritis" and identified that plaintiff's symptoms had been "stable for years." (AR 19, 700). Furthermore, the evidence cited by the ALJ showed that in July 2011, plaintiff was working out at a local fitness center and felt her energy level had improved. (AR 18, 472). The ALJ also discussed that plaintiff described her pain in March 2014 as "all good" and that she had "[n]o pain at rest." (AR 19, 20, 714). Thus, substantial evidence supports the ALJ's conclusion that Nurse Brown's opinions are at odds with the totality of the evidence.

In sum, the ALJ cited specific and legitimate reasons for assigning no weight to Nurse Brown's questionnaires, namely inconsistency with each other and the totality of the evidence without explanation or clinical findings presented as support. As these reasons are supported by

substantial evidence in the record, the ALJ did not err in assigning Nurse Brown's opinions no weight.

### 3.   The ALJ Properly Evaluated Plaintiff's Use of a Cane in Determining Plaintiff's Residual Functional Capacity

Finally, plaintiff challenges the ALJ's conclusion that the evidence did not show that plaintiff's arthritis in her knees and lower extremities was so severe as to mandate the use of a cane for ambulation, which in turn, did not require that plaintiff's use of a cane be considered in her residual functional capacity. (Docket no. 15 at 17). Instead, plaintiff claims that substantial evidence required the ALJ to consider how plaintiff's use of a cane would affect her residual functional capacity. (Docket no. 15 at 18). Plaintiff also contends that the ALJ erred when finding that a cane was not mandated by prescription. (Docket no. 15 at 17).

Social Security Ruling ("SSR") 96-9p provides guidance regarding the necessary showing for an ALJ to reach the conclusion that a claimant's hand-held device, such as a cane, is "medically required" where an individual is capable of less than a full range of sedentary work. SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996). SSR 96-9p requires the ALJ to consider the impact of "medically required" hand-held assistive devices and indicates:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and *describing the circumstances for which it is needed* (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

*Id.* (emphasis added). Courts in the Fourth Circuit have held that even where a claimant is prescribed a cane, substantial evidence may support a conclusion that the cane is not medically necessary, and as such, an ALJ's decision not to consider the impact of a claimant's cane use on her residual functional capacity is not error. *See, e.g., Morgan v. Comm'r, Soc. Sec.*, No. 13-CV-2088-JKB, 2014 WL 1764922, at *1 (D. Md. Apr. 30, 2014) (finding claimant's use of a cane

was not medically necessary where "treating physician not[ed] normal gait during examination," "x-ray show[ed] moderate degenerative changes in the left hip with some joint space loss and spurring" and an "examination demonstrate[ed] no pain on rolling test of hip[,]" and thus claimant was capable of light work with limitations); *Wimbush v. Astrue*, 4:10-CV-00036, 2011 WL 1743153, at *2–3 (W.D.Va. May 6, 2011) (plaintiff prescribed a cane, but did not show it was medically necessary where doctors observed that her gait was normal and exams indicated she was "functionally better than . . . her self-perception[,]" and thus was capable of light work).

In this case, while Nurse Brown prescribed for plaintiff's use of a cane for "99 months" "as directed" in June 2012, Nurse Brown did not describe the circumstances for which the cane is needed. (AR 496). In prescribing the use of a cane, Nurse Brown only noted that plaintiff had "right arm pain[,] numbness getting worse[,] had develped [sic] weakness in [right-upper extremities] and unsteady gait." (AR 495). The plaintiff testified before the ALJ that she "uses a cane to ambulate and she contended that she can't walk without it." (AR 17, 46).

The ALJ found "no such indications in the record" that plaintiff could not walk without a cane. (AR 17). The ALJ also indicated that "the evidence does not reveal that [plaintiff's] arthritis is so severe in her knees and lower extremities that it mandates the use of a cane for ambulation." (AR 20). The ALJ cited Drs. Delorenzo and Baldwin's February 5, 2014 notation of plaintiff's "antalgic appearing gait secondary to arthritic knee pain." (AR 20, 663). The ALJ also noted that a January 29, 2013 assessment provided that plaintiff's "[t]oe walking and heel walking" were normal and that plaintiff's "[g]ait and station" were normal. (AR 18, 452). The ALJ also noted plaintiff's physical therapy records, in which Dr. Paven identified that plaintiff's "[g]ait is stable" and her "[l]ower extremity strength is normal" on May 7, 2013, July 25, 2013, November 19, 2013, and February 13, 2014. (AR 730, 727, 725, 723). Her physical therapy

notes also indicate that plaintiff attended a physical therapy session on March 13, 2013 without her cane. (AR 441). Dr. Eapen's evaluation on August 10, 2012, considered by the ALJ (AR 19), also found that plaintiff's "gait appears stable without any assistive devices" and plaintiff "exhibits good mobility." (AR 326). Finally, the ALJ noted plaintiff's July 2013 EMG testing, which found that a "workup of cord imaging showed only mild arthritis" and identified that plaintiff's symptoms had been "stable for years." (AR 19, 700).

For these reasons, despite the ALJ's error in not identifying that cane use was prescribed by plaintiff's nurse practitioner in June 2012, any such error was harmless as the evidence is insufficient to show that the plaintiff's cane use was medically necessary. Accordingly, the ALJ's decision not to consider the impact of plaintiff's cane use on her residual functional capacity has substantial evidentiary support.

C.    The ALJ's Determination of the Medical Severity of Plaintiff's Impairments at Step Two in the Sequential Evaluation Process Is Supported by Substantial Evidence

Plaintiff contends that the ALJ's determination at step two of the sequential evaluation process was in error. (Docket no. 15 at 18). Specifically, plaintiff notes that the ALJ determined that plaintiff's severe impairments only included obesity, lumbar spinal disorder, and inflammatory arthritis. (AR 15). Plaintiff contends that the ALJ's conclusion that plaintiff did not suffer from carpal tunnel syndrome as a severe impairment was in error, as plaintiff's "treating providers specifically opined that carpal tunnel syndrome would cause" plaintiff to have work-related limitations. (Docket no. 15 at 18–19). Plaintiff also contends that in addition to failing to include carpal tunnel syndrome as a severe impairment, the ALJ "did not include limitations from [carpal tunnel syndrome] in the RFC determination[,] which is also an erroneous finding." (Docket no. 15 at 19 n.5).

A severe impairment is one that "significantly limits an individual's physical or mental abilities to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996). In turn, "[a]n impairment is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521, 416.921. If a claimant has no severe impairment, the disability evaluation process ends. 20 C.F.R. §§ 404.1520(c), 416.920(c). However, if the claimant is found to have a severe impairment, the evaluation process continues on to step three. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The province of a reviewing court here is not to reconcile inconsistencies in the medical evidence nor substitute its judgment for that of the Commissioner if her decision is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

At step two in this action, the ALJ found plaintiff's obesity, lumbar spinal disorder, and inflammatory arthritis to be severe impairments under 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). (AR 15). The ALJ did not find that plaintiff's severe impairments included carpal tunnel syndrome. (*Id.*). At step three, the ALJ considered plaintiff's complaints on February 9, 2009 of arthritic pain and stiffness in her hands. (AR 17, 456). The ALJ considered that plaintiff reported that Naproxen worked well for her arthritis, but upset her stomach. (*Id.*). Plaintiff's follow-up appointment in January 2010, in which plaintiff's physical-examination findings were within normal limits and plaintiff's doctor discontinued the medications prescribed to treat her arthritis (AR 459–60), was also considered by the ALJ (AR 18). The ALJ also noted that during a July 8, 2011 medical appointment, plaintiff indicated that she was working out at a local fitness center and found the activity helped alleviate stress in her life. (AR 18, 472–73).

The ALJ also considered an August 10, 2012 evaluation in which plaintiff was evaluated by Dr. Eapen for carpal tunnel syndrome, among other ailments. (AR 19, 324). The ALJ

discussed that Dr. Eapen's assessment noted that plaintiff's grip strength was 4/5 on the right and 5/5 on the left. (AR 19, 326). The ALJ also considered that Dr. Eapen conducted two tests for carpal tunnel syndrome during the assessment—Tinel sign and Phalen's sign—that were both negative. (AR 19, 326). Dr. Eapen's findings that plaintiff had "[n]o apparent hand muscle wasting" and that she was "able to make almost a complete fist" were also discussed by the ALJ at step three. (AR 19, 326). Additionally, a peripheral joint evaluation did not find any evidence of active joint inflammation, which the ALJ also discussed. (AR 19, 326). Furthermore, the ALJ considered Dr. Eapen's discussion of plaintiff's electrodiagnostic studies in July 2012 to "rule out carpal tunnel syndrome" in light of plaintiff's complaints of "pain with paresthesias in the right hand" and use of a brace for carpal tunnel syndrome. (AR 19, 324). Dr. Eapen noted that the "electrodiagnostic studies" were negative for carpal tunnel syndrome. (AR 324; *see also* AR 319, 529–30).

Finally, the ALJ considered plaintiff's physical-therapy treatment notes. (AR 19–20). The ALJ considered that at plaintiff's most recent physical therapy session on March 27, 2014, plaintiff reported, "[i]t's all good" and she had "[n]o pain at rest." (AR 20, 714). The ALJ also discussed that on that date, plaintiff had met 4 out of 5 of her therapeutic goals and was discharged from care. (AR 20, 714). The record indicates that the 4 goals met were: (1) plaintiff "will demonstrate at least a 75% improvement in functional activities by discharge or within 3 months"; (2) plaintiff "will improve wrist E/F by 25% without pain in < 3 weeks in response to splinting/HEP"; (3) plaintiff "will tolerate upgrade to wrist eccentrics to improve grip to > 8kgs without pain in 6 weeks"; and (4) plaintiff "will improve finger TAM of ring/little to >185 degrees to hold onto utensils for cutting food." (AR 714). This final discharge treatment note, as

41

noted by the ALJ, also does not contain any work limitations and only advised plaintiff to "wear splint at night and perform exercises for 1 week and then disregard." (*Id.*).

Based on the foregoing, the court finds that substantial evidence supports the ALJ's conclusion that plaintiff did not suffer from carpal tunnel syndrome as a severe impairment. The court also finds that the ALJ's lack of analysis of carpal tunnel syndrome in plaintiff's residual functional capacity is also supported by substantial evidence.

### D.    The ALJ Properly Evaluated Plaintiff's Credibility

Plaintiff next argues that the ALJ erred in finding her statements concerning the intensity, persistence, and limited effects of her alleged symptoms to be not entirely credible. (Docket no. 15 at 19). Specifically, plaintiff alleges that the ALJ failed to properly assess the effect of her use of a cane; her attempts at obtaining relief through ice packs, heating pads, physical therapy, pool therapy, a back brace, and a TENS unit; her use of a handicapped plate on her vehicle; and the persistence with which she sought treatment for pain. (Docket no. 15 at 20). The Commissioner maintains that substantial evidence supports the ALJ's credibility analysis, arguing that the ALJ fully considered plaintiff's testimony regarding her symptoms and the limited effects of those symptoms before rending his decision. (Docket no. 17 at 20–22). Based on the reasons set forth below, the court finds that the ALJ properly considered plaintiff's complaints along with the other findings and opinions in the administrative record.

When evaluating the intensity and persistence of a claimant's symptoms and the effect of those symptoms on a claimant's ability to engage in gainful activity, the ALJ may consider a claimant's treatment, other than medication; a claimant's daily activities; prior work record; and a claimant's own statements about his or her symptoms. *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Johnson v. Barnhart*, 434 F.3d 650, 657–58 (4th Cir. 2005). This court must give great

deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.' " *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this court is bound to accept the ALJ's credibility determinations unless they are "unreasonable, contradict[] other findings of fact, or [are] 'based on an inadequate reason or no reason at all.' " *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

After careful consideration of the evidence, the ALJ found that while the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (AR 17). In arriving at this conclusion, the ALJ did not find that plaintiff did not experience any pain or limitations related to her spinal condition or arthritis; instead, the ALJ accounted for plaintiff's existing severe impairments and found that plaintiff was capable of performing a range of light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b)[11] with limitations to accommodate the pain and restrictions she experiences secondary to her spinal condition and arthritis. (AR 20). The ALJ described those limitations as follows:

---

[11] Those sections provide:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

> [Plaintiff] is limited to occupations that require no more than occasional postural maneuvers, such as balancing, stooping, kneeling, crouching and climbing on ramps and stairs. She must avoid occupations that require climbing on ladders or crawling. She is limited to occupations which do not require exposure to dangerous machinery and unprotected heights.

(AR 20).

In assessing plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms, the ALJ first considered and identified discrepancies between plaintiff's testimony regarding the pain in her hands with her physical-therapy treatment reports. (AR 19–20). The ALJ discussed that while plaintiff testified that she can lift and carry about 1 to 2 pounds and was told by her physical therapists not to strain it (AR 17), she identified in her most recent physical therapy session, when asked about her pain, that "[i]t's all good" and that she had "[n]o pain at rest." (AR 20, 714). As previously discussed, the ALJ also noted that plaintiff had met 4/5 of her therapeutic goals and was discharged from physical therapy on March 27, 2014. (AR 20, 714). Indeed, one of those therapeutic goals was that plaintiff "will tolerate upgrade to wrist eccentrics to improve grip" to greater than 8 kilograms without pain. (AR 714).

The ALJ also discussed Dr. Eapen's findings that plaintiff's grip was 4/5 in her right hand and 5/5 in her left hand. (AR 19, 326). Additionally, as the court has already discussed, the ALJ considered plaintiff's testimony regarding her use of a cane and found that a cane was not medically necessary. In his findings, the ALJ cited Drs. Delorenzo and Baldwin's February 5, 2014 notation of plaintiff's "antalgic appearing gait secondary to arthritic knee pain." (AR 20, 663). The ALJ also discussed plaintiff's January 29, 2013 assessment, which noted that her "[t]oe walking and heel walking" were normal and that plaintiff's "[g]ait and station" were normal. (AR 18, 452). Additionally, the ALJ discussed plaintiff's physical therapy records, in

44

which Dr. Paven identified that plaintiff's "[g]ait is stable" and her "[l]ower extremity strength is normal" on numerous occasions in 2013 and in February 2014. (AR 20, 730, 727, 725, 723).

Finally, while plaintiff argues that the ALJ failed to consider her "attempts at obtaining relief through ice packs, heating pads, physical therapy, pool therapy, a back brace, and a TENS unit" and the "sheer persistence with which she sought treatment for pain," the ALJ considered these complaints. Indeed, the ALJ considered that a July 2013 EMG of plaintiff's lower extremities showed "no evidence of neuropathy" and a "workup of cord imaging showed only mild arthritis." (AR 19, 700). The ALJ also discussed that the same assessment found plaintiff's symptoms had been "stable for years." (AR 19, 700). Additionally, the ALJ considered that on July 8, 2011, the plaintiff noted that she was working out at a local fitness center and her energy level had improved. (AR 18, 472).

For the foregoing reasons, the record in this case fails to show any "exceptional circumstances" that would lead the court to disturb the ALJ's credibility determination. Accordingly, because the ALJ's credibility determination is supported by substantial evidence, the plaintiff's argument that the ALJ erred in failing to give more credit to plaintiff's statements is without merit.

>   **E.    The ALJ's Determination That Plaintiff's Residual Functional Capacity Permits Her to Perform Past Relevant Work as a Packager or Alternatively, Jobs That Exist in Significant Numbers in the National Economy, Is Supported by Substantial Evidence**

Plaintiff contends that because the ALJ improperly evaluated her complaints of carpal tunnel syndrome, her residual functional capacity, her credibility, and the opinions of her treating physician and nurse practitioner, the ALJ's subsequent determination that plaintiff's residual functional capacity permits her to perform past relevant work as a packager, or alternatively, other jobs that exist in significant numbers in the national economy, is without substantial

evidence. (Docket no. 15 at 21). The Commissioner asserts that the ALJ's hypothetical question to the vocational expert regarding the ability of an individual with plaintiff's residual functional capacity to perform past relevant work or other jobs that exist in significant numbers in the national economy adequately reflected a residual functional capacity for which the ALJ had substantial evidence. (Docket no. 17 at 22). Accordingly, the Commissioner argues that the ALJ's determinations at steps four and five are supported by substantial evidence. (*Id.*).

Upon determination of a claimant's residual functional capacity at step three in the sequential process, the ALJ must next determine whether the claimant is capable of returning to past relevant work—step four in the adjudication of disability claims. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the ALJ finds in the affirmative in step four, the ALJ will conclude that the claimant is not disabled. *Id.* However, if the ALJ finds that the claimant is not capable of returning to past relevant work, review will then proceed to step five. *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). At step five of the adjudication, the ALJ must determine whether the individual is capable of adjustment to other work. 20 C.F.R §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If a claimant's residual functional capacity limits her ability to perform the full range of work at a particular level, the ALJ must determine in this step whether there is work available in the national economy that the particular claimant can perform given her individual limitations. *See Walker v. Bower*, 889 F.2d 47, 49–50 (4th Cir. 1989). This determination can be aided by a vocational expert who has been made aware of all the evidence in the record and to whom hypothetical questions are posed that "fairly set out all of [a] claimant's impairments." *Id.* at 50. "A hypothetical question is unimpeachable if it 'adequately reflect[s]' a residual functional capacity for which the ALJ had sufficient evidence." *Fisher v.*

46

*Barnhart*, 181 F. App'x 359, 364 (4th Cir. 2006) (per curiam) (unpublished) (citing *Johnson v.*

*Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005)).

Here, at step three in the sequential process, the ALJ determined that the plaintiff had the

residual functional capacity to

> perform a range of light work as defined in 20 CFR [§§] 404.1567(b) and
> 416.967(b)[[12]]. She is limited to occupations that require no more than occasional
> postural maneuvers, such as balancing, stooping, kneeling, crouching and
> climbing on ramps and stairs. She must avoid occupations that require climbing
> on ladders or crawling. She is limited to occupations, which do not require
> exposure to dangerous machinery and unprotected heights.

(AR 16). Based upon this residual functional capacity, the ALJ next considered whether the

plaintiff was capable of performing past relevant work as a packager, which is classified as

medium unskilled work, but which plaintiff performed at the light exertional level—as identified

by Patricia Jillary, a vocational expert who provided testimony to the ALJ to aid in his analysis.[13]

(AR 20, 52). The ALJ asked the vocational expert to "assume a hypothetical individual with the

same age, education[,] and work experience as the claimant" who would be limited to a range of

light work and "[w]ould be limited to occupations requiring no more than occasional posturals[,]

such as balancing, stooping, kneeling, crouching as well as climbing on ramps and stairs but

must avoid occupations that would require climbing on ladders" and "exposure to dangerous

machinery and unprotected heights." (AR 53). Based on this hypothetical, the ALJ asked the

vocational expert whether such a person could perform any of the claimant's past relevant work.

---

[12] *See supra* note 11 (definition of light work in 20 C.F.R. §§ 404.1567(b), 416.967(b)).
[13] The vocational expert identified that in plaintiff's previous position as a hand packager, plaintiff "was required to type in work orders, then pack them in boxes, and that consisted of packing small products such as peanuts and prizes at a desk." (AR 52). The vocational expert indicated that this previous job "would be classified as a hand packer – packager and it was performed at the light duty exertional level based upon the information contained in the work history report of lifting of 20 pounds [and] standing for two hours." (*Id.*). Plaintiff does not dispute the characterization that she performed her prior work as a hand packager at the light exertional level.

(*Id.*).  The vocational expert indicated that such a claimant could perform past work as a hand

packager[14] as performed at the light-duty level.  (*Id.*).

As an alternative finding, the ALJ proceeded to step five and considered whether, when

considering the plaintiff's age, education, work experience, and residual functional capacity, jobs

that the plaintiff can perform exist in significant numbers in the national economy.  The ALJ

relied upon the same hypothetical person as described above.  (AR 53).  The ALJ asked the

vocational expert whether such a hypothetical individual would be able to perform other work.

(*Id.*).  The vocational expert indicated that such an individual would be able to perform the work

of representative unskilled, light positions such as: box inspector, U.S. Dep't of Labor,

*Dictionary of Occupational Titles*, § 762.687-014 (4th ed. 1991); ticketer, *Id.* § 229.587-018; and

produce weigher, *Id.* § 299.587-010.[15]  The vocational expert testified that each of the

representative occupations would be available in significant numbers in the national economy

and plaintiff's regional economy.  (AR 54).  After considering the other evidence in the record

and the vocational expert's testimony, the ALJ concluded, in the alternative to his step four

finding, that the plaintiff was capable of making a successful adjustment to other work that exists

in significant numbers in the national economy.  (AR 21).

First, plaintiff does not dispute that the hypothetical question posed by the ALJ

adequately reflected the plaintiff's residual functional capacity, as determined by the ALJ in step

---

[14] *See* Packager, Hand, U.S. Dep't of Labor, *Dictionary of Occupational Titles*, § 920.587-018 (4th ed. 1991).

[15] The vocational expert identified "sample [Dictionary of Occupational Titles]" in her testimony by job code, but did not precisely identify the name of each occupational title.  (AR 54).  The ALJ incorrectly identifies these sample occupational titles as "sorter," "stock clerk," and "weigher," respectively, in his opinion.  (AR 21).  However, in his opinion, the ALJ cited the same Dictionary of Occupational Titles job codes as provided in the vocational expert's testimony.  (AR 21, 54).  Plaintiff does not raise this specific error and the court declines to address it.  However, the court does note that the Fourth Circuit has cited with approval dictum from the Third Circuit that noted that an ALJ's erroneous citation to the Dictionary of Occupational Titles is not per se reversible error.  *See Fisher v. Barnhart*, 181 F. App'x 359, 367 (4th Cir. 2006) (per curiam) (unpublished) (citing with approval *Burns v. Barnhart*, 312 F.3d 113 (3d Cir. 2002)).

three. On this issue, the court agrees with the Commissioner that the hypothetical posed by the ALJ accurately reflected the ALJ's assessment of plaintiff's residual functional capacity. (Docket no. 17 at 22). Plaintiff also does not dispute that her past relevant work as a hand packager, as performed, and the representative unskilled, light positions identified by the vocational expert do not exceed her residual functional capacity, as determined by the ALJ. Thus, plaintiff's argument that the ALJ's hypothetical question to the vocational expert was incomplete relies upon plaintiff's argument that the ALJ erred at steps two and three. Specifically, that the ALJ erred in evaluating her complaints of carpal tunnel syndrome, determining her residual functional capacity, evaluating her credibility, and weighing and evaluating the opinions of her treating physician and nurse practitioner. (Docket no. 15 at 21).

As the court has concluded, however, the ALJ's determination of the medical severity of plaintiff's impairments at step two, his determination of plaintiff's residual functional capacity at step three, and his evaluation of plaintiff's credibility are all supported by substantial evidence and were properly determined by the ALJ in accordance with applicable law. The court also concluded that the failure to discuss the legal opinion rendered by plaintiff's treating physician was harmless error. Thus, because the ALJ's determination of plaintiff's residual functional capacity is supported by substantial evidence and the hypothetical posed accurately reflected this residual functional capacity, the ALJ's determination that plaintiff could perform her past relevant work as a hand packager, which was performed at the light exertional level and did not exceed plaintiff's residual functional capacity, is supported by substantial evidence. Next, alternatively, because the hypothetical question posed to the vocational expert accurately reflected a residual functional capacity for which the ALJ had substantial evidence and was properly determined in accordance with applicable law, the ALJ did not err at step five. Thus,

the ALJ's determinations at step four and alternatively, at step five, of the sequential evaluation process are supported by substantial evidence and were decided in accordance with applicable law.

## V. CONCLUSION

Based on the foregoing, the Commissioner's final decision rendered on June 9, 2014— denying benefits for the period of November 17, 2009 through June 9, 2014—is supported by substantial evidence. The court also finds that proper legal standards were applied when evaluating the evidence and determining the credibility of various medical sources. Accordingly, plaintiff's motion for summary judgment (Docket no. 14) is denied; the Commissioner's motion for summary judgment (Docket no. 16) is granted; and the final decision of the Commissioner is affirmed.

Entered this 21st day of April, 2016.

_____/s/_____
John F. Anderson
United States Magistrate Judge____
John F. Anderson
United States Magistrate Judge

Alexandria, Virginia

50